Henry L. JACKSON, Appellant,

v.

Barbara JACKSON, Appellee.

No. 82–506.

District of Columbia Court of Appeals.

Argued March 23, 1983.

Decided May 11, 1983.

---

Patricia A. Barnes, Washington, D.C., for appellant.

Stanley M. Dietz, Washington, D.C., for appellee.

Before NEBEKER, PRYOR and TERRY, Associate Judges.

TERRY, Associate Judge:

On this appeal from an order granting the parties an absolute divorce, appellant challenges only that portion of the order which denied his request for visitation rights with his son. We hold that the trial court did not abuse its discretion in denying that request.

I

The parties were married on September 7, 1968, and on September 22, 1970, their only child, Michael Jackson, was born. In November 1972 the parties separated.

Appellee testified that during her courtship with appellant, she noticed that he was overly dependent on his family, particularly his mother, and that he sometimes exhibited "lapses of memory." Nevertheless, she "cared about him, [and] . . . because he was in church, [she] wanted someone with whom [she] could carry out church work," so they were married. Major problems developed, however, when Michael was born.

Appellee decided to stay at home the first two years and care for Michael. Appellant was unhappy with this decision, apparently because his mother wanted appellee to return to work while she herself took care of the child. Their family life progressively deteriorated. One day appellant's supervisor at work called appellee and recommended that appellant see a psychiatrist. Together appellant and appellee visited the psychiatrist, who told appellee that her husband was very ill and needed immediate hospitalization.[1]

Appellant occasionally exhibited abnormal behavior. For example, appellee testified that appellant would lock her and Michael in a room and not let them out, that he sprayed her with mace "at least a dozen" times, and that twice he tied her hands behind her back.[2] Once he disappeared for an entire week, leaving no trace of his whereabouts.

1. Appellant was hospitalized at Saint Elizabeths Hospital on four occasions: for one year in 1974, one month in 1976, one month in 1977–1978, and one month in 1980. In the first two admissions, he was diagnosed as suffering from paranoid schizophrenia; in the latter two, from chronic undifferentiated schizophrenia.

At the time of trial, appellant was seeing a Saint Elizabeths psychiatrist every two months on an out-patient basis.

2. Appellee's testimony was partly corroborated by the testimony of her friend, Ianthia Neville.

Appellant's bizarre behavior continued after their separation. For example, appellee testified that once while she was attending a choir rehearsal, appellant came to the church and placed on top of the piano a graduation card to her "to which he signed the name of one of the members of [the] church, and ... put two prophylactic rubbers in there and also one church offering envelope." She stated that since their separation in 1972, appellant had never expressed any desire to see Michael regularly until about a year before the trial. She also testified that she encouraged her son "to be sympathetic [towards his father] because he just [was] not himself," but she felt that the decision whether to see his father "should be his decision."

Appellant had some difficulty answering simple questions put to him by his counsel, and at times his testimony was disjointed and confused. When asked about his reasons for wanting to visit his son more often, he said, "It would encourage him to become more advanced in learning English and how to print and write his name." In response to questions about what activities he would engage in with his son if he were granted visitation rights, appellant's answers were vague and, as the trial court noted, showed that he "seemed to plan none of the visitation activities that are ordinary for a boy of Michael's age .... Only through leading questions on redirect did [appellant's] lawyer elicit responses about visiting museums."

Dr. Christine K. Kehne, a psychiatrist at Saint Elizabeths Hospital, testified that appellant's mental health would improve if he had more contact with his son. She recommended that a visitation program be established with initial bi-weekly visits of three to four hours in the company of some family member. After six months, Dr. Kehne suggested, the court could review the case and, depending on the degree of progress, decide whether unchaperoned visits might be feasible. Although Dr. Kehne had never met with Michael to discuss her plan, she testified that she had "no doubt whatsoever" that a visitation arrangement "would be an entirely safe and desirable experience for them both under reality conditions ...."

## II

"Trial court determinations of custody, child support, visitation rights, and counsel fees ... are subject to reversal only for clear abuse of discretion." *Moore v. Moore,* 391 A.2d 762, 770 (D.C.App.1978) (citations omitted). On the other hand, we have held that "[t]he denial to a parent of his right of visitation with his children, who are in custody of the other parent, is a drastic action ... justified only in extreme cases." *Paine v. Paine,* 201 A.2d 20, 22 (D.C.App.1964). In *Surrey v. Surrey,* 144 A.2d 421 (D.C.Mun. App.1958), we recognized that a mother's illness "would not ipso facto deprive her of the privilege of seeing her children."

When custody of children has been awarded to one parent, the parent deprived of their custody has the right of visitation with the children and ought not to be denied that right unless by his conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children.

*Id.* at 423; *see Townsend v. Townsend,* 205 Md. 591, 597, 109 A.2d 765, 768 (1954). After reviewing the record, we have concluded that this is the sort of "extreme" case contemplated in *Paine,* and that the trial court therefore did not abuse its discretion in denying appellant's request for visitation rights.

Appellant contends that the trial court did not give proper weight to the testimony of Dr. Kehne recommending that a visitation program be established.[3] The record

**3.** Appellant also argues that the court erred in not making a more detailed statement of its findings and conclusions, and in failing to refer this case to the Social Services Division for an investigation of the conditions in appellant's home. These arguments are totally without merit. The trial court's six-page memorandum opinion satisfied the requirement for detailed findings, and, given the evidence of appellant's mental condition, there was no occasion to call

does not support this contention. The trial court's opinion shows that it fully considered Dr. Kehne's testimony concerning appellant's mental state and the desirability of granting him visitation rights. The court concluded, however:

> There is not the slightest doubt that Dr. Kehne testified as a conscientious and sympathetic advocate for Mr. Jackson and for visitation with his son, which she views as an important factor in Mr. Jackson's recovery. However, it is just as clear that Dr. Kehne has no personal knowledge of Michael's needs or sensibilities, or what would be in his best interests. The basic thrust of her testimony was that visitation should be granted because it would be therapeutic for Mr. Jackson.

The possible therapeutic benefits to appellant of a visitation program are totally irrelevant. We have repeatedly and consistently held that in any case involving child custody, the "controlling consideration" is the best interest of the child. *Utley v. Utley,* 364 A.2d 1167, 1170 (D.C.App.1976). "The best-interest-of-the-child concept has, indeed, been the standard in this jurisdiction since the beginning of the century." *Bazemore v. Davis,* 394 A.2d 1377, 1379 (D.C.App.1978) (en banc) (citations omitted). The same principle, of course, applies to visitation rights, since visitation is simply a species of temporary custody. *See Rice v. Rice,* 415 A.2d 1378, 1383 (D.C.App.1980) (modification of visitation rights under a divorce decree "must be reasonably calculated to promote the child's best interest and welfare," citing *Utley v. Utley, supra*).

The trial court determined that in order to ensure Michael's continued welfare, it would deny appellant's request for visita-

tion rights. In reaching this conclusion, it considered appellant's mental history, his demeanor on the witness stand (leading it to conclude that appellant was not "a totally normal person"),[4] the nine-year period which elapsed before appellant asserted any desire for visitation rights, and the testimony of Dr. Kehne. The court's reasoning is set forth in a carefully written memorandum opinion, supplemented by an order denying appellant's motion for new trial. Having reviewed the entire record, we are satisfied that the trial court did not abuse its discretion.[5]

*Affirmed.*

---

upon the expertise of the Social Services Division.

4. Dr. Kehne's testimony concerning appellant's mental state was not binding on the court. *Mann v. Robert C. Marshall, Ltd.,* 227 A.2d 769, 771 (D.C.App.1967); *see Hughes v. Pender,* 391 A.2d 259, 263–264 (D.C.1978).

5. Our examination of the sealed record containing the results of the interview between Michael and the court in chambers buttresses our conclusion that the trial court ruled correctly. We do not base our holding on the sealed record, but merely find further support in it for our determination, based on the unsealed portion of the record, that the trial court did not abuse its discretion.